MRS. VIVIAN J. MORRAH v. FIRST NATIONAL BANK et al.

Eastern Section.   August 6, 1932.

Petition for Certiorari denied by Supreme Court, October 15, 1932.

Whitaker & Whitaker, of Chattanooga, for appellant.

Williams & Sizer, and Cantrell, Meacham & Moon, all of Chattanooga, for appellee.

PORTRUM, J.   The question for review is whether or not the First National Bank is entitled to be subrogated to the first mortgage lien of the Fidelity Trust Company, which was paid and discharged by the bank upon the faith of a written release executed by the payee of the note secured by a second lien, for the purpose of constituting the First National Bank's mortgage a prior lien, as against the appellant, Mrs. Vivian J. Morrah, who had purchased from the payee the note secured by the second lien prior to the execution of the release.

On the 19th day of September, 1928, Lee H. Battle was the

owner of the property involved, located in Highland Addition, in the City of Chattanooga; this property was encumbered with the first mortgage in favor of the Fidelity Trust Company of Knoxville, executed in September, 1923, and securing the sum of $7500, payable in installments of $250 each six months. In September, 1928, the principal sum had been reduced by five payments to the sum of $5250. On the date stated Lee H. Battle sold this property to Mrs. A. W. Leighton in consideration of her assumption of a first mortgage on the property, above described, and the execution to him of thirty-eight notes in the sum of $40 each and one note in the sum of $39, the first payable on November 1, 1928, and one on the first day of each month following, until the entire series were discharged.

Shortly after the delivery of these notes to the payee, and before the maturity of the first note, Lee H. Battle sold them, with the exception of three or four, which were the last to mature, to the appellant, Mrs. Vivian J. Morrah (wife of Battle's employee, who had worked for sometime in Battle's real estate office), at a discount of twenty per cent of the face of the notes, endorsing them in blank and delivering them to Mrs. Morrah. Mrs. Morrah placed these notes with the Chattanooga Savings Bank & Trust Company for collection, and when the first four notes matured the maker paid them to the trust company, as they matured, and the funds as paid were placed to the savings account of Mrs. Morrah. The maker did not know the notes were the property of Mrs. Morrah.

In March, 1929, Mrs. Leighton, the purchaser of the property, was unable to pay the semi-annual installment of $250 due under the first mortgage to the Fidelity Trust Company; it was necessary that she refinance this first mortgage loan in order to avoid a foreclosure, and she made application to the First National Bank for a new loan to take up and discharge the first loan, or mortgage, and with a view of gaining an extension of time in the payment. On March 18, the application was allowed and a trust deed drawn securing a loan of $5500, and no part of the principal became due until after the expiration of three years from its date. From this fund the loan of the Fidelity Trust Company was discharged, which amounted at the time to the sum of $5455.27. The Fidelity Trust Company released its lien of record on May 2, 1929.

But in the meantime, and before the First National Bank would make the loan and discharge the first lien due to the Fidelity Trust Company, it required the payee of the second lien notes, and the supposed holder of these notes, to execute a release of any claim to a first lien that might accrue to the payee, because of the payment and discharge of the lien held by the Fidelity Trust Com-

pany. Battle represented to the bank that he was the holder of these second lien notes, and he executed the release with the express purpose of declaring the second lien inferior to the lien of the bank. Upon the face of this release the first lien was discharged by the payment of the amount due from the funds derived from the loan made by the First National Bank.

This new loan enabled Mrs. Leighton to continue the payments of her monthly notes, secured by the second mortgage, and she paid fifteen of these notes, or $600 on the second mortgage after the first had been refinanced as above detailed, together with the interest which had accumulated on the fifteen notes. But when the next note matured Mrs. Leighton was unable to pay it, and in time the entire series held by Mrs. Morrah were placed in the hands of her attorney for collection. Mrs. Morrah then discovered that the first loan had been refinanced, and that Mr. Battle had executed the release, upon the faith of which the loan had been refinanced, purporting to be the owner of the notes, and without her knowledge or consent.

She then instituted this suit, seeking to have her lien declared a first and prior lien, and a foreclosure of the land. Alleging that her notes were secured by a vendor's lien, declared so to be, and also by a trust deed of record, and when the first mortgage was paid without her knowledge or consent, her lien, by operation of law, was made superior to a lien thereafter created. She further alleges that her rights were materially and adversely affected by the attempt to constitute the mortgage of the bank a first mortgage, and superior to her lien.

The bank answered and filed a cross-bill, seeking subrogation to the lien of the Fidelity Trust Company, which was discharged under a mistake of fact, or the fraud of Lee H. Battle, which the complainant now seeks to take advantage of. But it is inequitable to permit her to take advantage of the mistake, or Battle's fraud, because she was not injured by it, but it was to her advantage.

The Chancellor granted the equitable relief of subrogation, or equitable assignment, and held that the loan of the bank to the amount of the sum advanced in discharge of the Fidelity Trust Company's loan was a superior lien upon the property. Mrs. Morrah has appealed.

There is but one assignment of error, which reads:

"The Chancellor erred in decreeing that the First National Bank was entitled to be subrogated to the mortgage of the Fidelity Trust Company, and that it was entitled to enforce the lien of this mortgage as a claim against the property prior to your appellant's lien, and in adjudging the cost against your appellant."

Subrogation, or an equitable assignment, will be denied when the party seeking it has been guilty of culpable negligence, or where the remedy cannot be granted without doing injustice to other persons. The modern doctrine of subrogation, and its application, is elaborately reviewed in the case of Dickson v. Morgan, 154 Tenn., 389, 285 S. W., 558, and it is not necessary to enter into a discussion of this principle here. We need only to apply the rules of law laid down in the Dickson case to the facts of this case.

We do not think the bank was guilty of culpable negligence in relying upon the representation of Battle, the payee in the notes secured by the second lien, to the effect that he was in fact the holder of the notes, and upon this representation securing the release of the asserted claim, or the acknowledgment that the bank's lien was the superior lien. The bank, and the maker of the notes had no right to demand the production of the notes to verify the representation of Battle. It might have been wise, as a matter of precaution, to have requested Battle to produce the notes, as is illustrated by this case, but there was no way to enforce the demand, and it was not reasonable to suppose that Battle would wilfully misrepresent the matter, or that he could have forgotten a matter of this importance. Further, then he had the reputation of a man of integrity, and under the circumstances the ordinary prudent man would have relied upon his representation that he was the owner of the notes. Certainly the bank was not guilty of culpable negligence and only negligence of that degree, which repels a party from a court of equity will defeat his right to subrogation. Dickson v. Morgan, supra.

But it is insisted the bank had actual knowledge of Mrs. Morrah's ownership at the time of the misrepresentation of Battle, and the execution of the release, and it was culpable negligence to act in disregard of this knowledge. This insistence is made for the first time in this court, and the Chancellor made no reference to it in his finding of facts. It is stated that the notes were placed by Mrs. Morrah in the First National Bank for collection, with direction that the proceeds were to be placed to her savings account, and that they gave notice upon their face of the lien securing them, at a time prior to the refinancing of the loan by the defendant bank. That these facts and records brought knowledge of Mrs. Morrah's ownership home to the bank, and the bank should have acted upon this knowledge. A question, asked by counsel for the defendant, of Mrs. Leighton stating that the notes were with the First National Bank, and the witness answered this question in the affirmative, which indicated that the notes were with the First National Bank. Counsel now states this was a mistake on the part of counsel asking the question, and the mistake

is established by the record. That the four notes that matured prior to the refinancing were in the hands of the Chattanooga Savings Bank & Trust Company, and paid to it, and applied to Mrs. Morrah's savings account in that bank, which fact is established by the cancellation stamp appearing upon the notes, filed as exhibits to the record. The Court has verified this statement, and counsel for the appellant made no reply, and we think none was available. It follows that the bank did not have actual knowledge of Mrs. Morrah's ownership prior to the refinancing transaction.

The appellant insists that it would be unjust to her to grant the right of subrogation, for it would deny to her rights which would have accrued to her had the first mortgage not been refinanced. And she cannot now be placed in her former position. If this is true, it is a good defense. We will let counsel state just how the appellant has been injured.

"Now, while we do not concede that it is necessary to show that Mrs. Morrah would have been injured by the release of this mortgage without her consent, still as a matter of fact it seems evident that she has been injured. In the first place, suppose the payment on the Fidelity mortgage had been made as agreed. By very simple calculation the Court will see that since September, 1928, when Mrs. Morrah bought these notes, there have matured on the Fidelity mortgage five semi-annual payments, a total of $1750, reducing this prior mortgage to $3500. Had the payments been made, therefore, according to the terms of this mortgage, there would have been only $3500 prior to Mrs. Morrah's mortgage to date, whereas no payments have been made at all on this mortgage and there is, therefore, now due $5455.27. Manifestly then, Mrs. Morrah has been decidedly injured, if these payments had been made in accordance with its terms.

"Now, it is true that Mrs. Leighton says in her deposition that she could not have made these payments, but whether or not she could have, had she been in imminent danger of having her property foreclosed, no one can say with certainty. At least she probably would have done something to make some of these payments and staved off foreclosure as long as possible.

"But, suppose she hadn't made the payments, then it was within the power of the Fidelity Trust Company to have foreclosed this mortgage; and certainly this is what they would have done before financial conditions in this country became so bad as they are today. At least, it is inequitable to deprive Mrs. Morrah of the chance that they would have foreclosed it before conditions got so bad. Had they foreclosed

it back in 1929 instead of these dark days in 1932, of course the property would have brought much more than it would today, and therefore, there would have been much more to have applied on the second mortgage than there would be today, if indeed the property · today would bring even the amount of the first mortgage.

"By the release then of this Fidelity mortgage by the First National Bank, Mrs. Morrah has been deprived of the right to have a sale of this property in good times instead of these depressed times. Certainly, this does her great injustice, an injustice that equity would not perpetrate in order to relieve the bank of this mistake, for which Mrs. Morrah was in no way to blame. If there was nothing more to the case, therefore, than a deception of the bank by the false representation of Battle, it must ·be the bank who must suffer therefrom, rather than Mrs. Morrah, because the bank could have prevented the fraud by demanding of Battle proof of the fact that he was the holder of the notes, whereas Mrs. Morrah had no knowledge whatsoever of the transaction, and, therefore, no opportunity to protect herself. The maxim is that where one of two innocent persons must suffer, the one whose conduct or failure to act prudently has made possible the fraud must be the one to suffer."

We reduce this argument to two propositions, first, that Mrs. Morrah had the right to expect that the first loan, or lien, would be reduced at the rate of $250 each six months, thereby increasing her security by each payment, and this right was lost under the new mortgage for no payment on the principal was due for a period of three years. Second, that in case of default, she, as a second lienor, had a right to insist upon an immediate foreclosure, at a time when property values were higher, and when she would, in all probability, have received a part if not all of her loan. And the appellant testified at the hearing that she positively would not have parted with these rights if requested to sign the release at the time of the bank's loan. We will discuss these propositions in the order named.

1. The holder of a second mortgage is always anxious that the first mortgage be rapidly discharged and he has a right to expect it until the obligator defaults, then his remedy is a legal foreclosure, and this measures his right against an insolvent obligator. This was the extent of the right contemplated at the date the obligations were created, and the default necessarily cuts off all rights that would have accrued had there been no default. The loss accruing to Mrs. Morrah by the failure of Mrs. Leighton to pay the installment then due upon the first mortgage, and the subsequent

installments, was not caused by the refinancing of the first loan, but by Mrs. Leighton's inability to pay the installment when due. Therefore, it is not unjust for this reason to deny the right of subrogation. Mrs. Morrah's right then was that of a foreclosure only.

2. It must be conceded that a foreclosure in 1929, when prices were at least equitable, was a more valuable right than a foreclosure now when prices of real estate are depressed by the general depression. But this fact does not necessarily make it unjust for the Court to grant the relief of subrogation; for if the refinancing arrangement of 1929 was so advantageous to Mrs. Morrah that a person of ordinary business ability would gladly have accepted it in lieu of an immediate foreclosure, then it is inequitable to allow Mrs. Morrah to say now, when she is necessarily disqualified by self-interest from stating what her mind would have been then, to now state she would not have accepted the plan, and would have demanded an immediate foreclosure. She did not anticipate the depression. If the Court is of the opinion that a person of ordinary business prudence, placed in Mrs. Morrah's position, would gladly have accepted the refinancing plan, and have joined in the release, then the Court will hold it inequitable for Mrs. Morrah to arbitrarily state now that she would not have accepted the plan then. It is true that some authorities cited by the appellant hold that the courts are bound by the present statement of the party resisting the application of the doctrine; the Tennessee cases are not in line with this holding. There should be some good reason existing at the time of the transaction to justify the present assertion that the party would not have consented. A court of equity will not be bound by the arbitrary opinion of a party, especially when it works great injustice to an opposite party, and is to the material interest of the party asserting the opinion.

In March, 1929, only four of the $40 monthly notes had been paid, or $160, leaving due on the second mortgage $1839 principal, and $55.17 interest, in all $1894.17; and a balance of $5455.27 was due on the first mortgage held by the Fidelity Trust Company. The mortgagor was unable to pay the installment due under the first mortgage, and save an immediate foreclosure, which would have made it necessary for the second mortgagee to have protected her interest by the purchase of the property in case no bidder bid a sufficient sum to protect her. The monthly payments were being regularly made on the second mortgage.

To avoid a foreclosure the first loan was taken up, and under the new loan no payment was required on the principal for a period of three years, or thirty-six months. At this time four of the monthly notes secured by the second mortgage had been paid,

leaving due thirty-four monthly notes. And after the execution of this last mortgage the mortgagor continued to pay these monthly notes for fifteen months, or until the sum of $600 and interest had been discharged. Her financial condition then became such that she could not discharge the monthly notes, and defaulted. Had she been able to pay the monthly notes the entire sum secured by the second mortgage would have been discharged before the first payment of the principal would have fallen due under the bank's mortgage. The second mortgage then became first in time, and permitted the holder of the second mortgage to apply all of the available assets of the mortgagor to the second obligation, and under the arrangement the second mortgagor in fact received more than $600. In 1923 the Fidelity Trust Company loaned $7500 on this property, and in 1929 the loan had been reduced to $5400, so the advantages under this refinancing arrangement were so great to the second mortgagee that a person of business prudence would have readily availed himself of them, in preference to an immediate foreclosure of the property. We do not think anyone of practical experience if consulted at the time would have advised Mrs. Morrah not to have accepted the advantages and signed the release requested of Mr. Battle. Under such circumstances it would be inequitable and unjust to the bank to allow Mrs. Morrah to assert the opinion that she would not have accepted the proposition then, and to permit her to rely upon a mistake, which caused the bank to discharge the first lien without securing her release. She cannot profit at the expense of another under such circumstances.

This record does not present the case of one the least blameworthy being called upon to suffer for the mistake of another, caused by the fault of a third; Mrs. Morrah was protected by the endorsement of her notes by Battle, the person causing the mistake, had she availed herself of it; and, perhaps, this explains the conduct of Battle in signing the release,—he desired to take advantage of the transaction to protect his endorsement.

We find no error in the judgment of the lower court and it is affirmed with cost. The case will be remanded to carry out the order of reference granted in the lower court.

Thompson and Snodgrass, JJ., concur.